**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**TAMMIE DAVIS, INDIVIDUALLY AND AS LEGAL GUARDIAN OF BABY C.S. ON HER BEHALF**

**Plaintiff,**

**v.**

**MDL No. 2804**
**Judge Dan Aaron Polster**
**Civil Action No.:________________**

**MCKESSON CORPORATION;**
**CARDINAL HEALTH, INC.;**
**AMERISOURCEBERGEN CORPORATION;**
**TEVA PHARMACEUTICAL INDUSTRIES, LTD.;**
**TEVA PHARMACEUTICALS USA, INC.;**
**CEPHALON, INC.;**
**MYLAN PHARMACEUTICALS, INC.;**
**JOHNSON & JOHNSON;**
**JANSSEN PHARMACEUTICALS, INC.;**
**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.;**
**ENDO HEALTH SOLUTIONS INC.;**
**ENDO PHARMACEUTICALS, INC.;**
**ALLERGAN PLC f/k/a ACTAVIS PLC;**
**WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.;**
**WATSON LABORATORIES, INC.;**
**ACTAVIS LLC;**
**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.;**
**DEPOMED, INC.;**
**PAR PHARMACEUTICAL, INC.;**
**PAR PHARMACEUTICAL COMPANIES, INC.;**
**NORAMCO, INC.;**
**INDIVIOR, INC.;**
**CVS HEALTH CORPORATION;**
**WALGREENS BOOTS ALLIANCE, INC.;**
**WALGREEN EASTERN CO.;**
**WALGREEN CO.;**
**WAL-MART INC. f/k/a WALMART STORES, INC.;**
**H.D. SMITH, LLC;**
**H.D. SMITH HOLDINGS, LLC; and**
**H.D. SMITH HOLDING COMPANY,**

**JURY TRIAL DEMANDED**

**Defendants.**

## COMPLAINT

**NOW COMES** Plaintiff, Tammie Davis, individually and as Legal Guardian of Baby C.S., (hereinafter "Plaintiff" or "Baby C.S.") and hereby file their Complaint against the Defendants for damages. In support thereof, Plaintiff states as follows:

## JURISDICTION AND VENUE

1. This Court is vested with jurisdiction by virtue of the parties' diversity, 28 U.S.C. § 1332. Minimal diversity exists between named Plaintiff, whose child was born in the State of Oregon. The amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over Defendants, each of which has committed one or more actions alleged in this Complaint within the State of Oregon. Moreover, Defendants have substantial contacts and business dealings directly within Oregon by virtue of their distribution, dispensing, and sales of prescription opioids.

3. Plaintiffs reserve the right to move for transfer to the U.S. District Court for the District of Oregon at the conclusion of pretrial proceedings and assert that Oregon law applies. Plaintiffs rely on CMO 1 that this case will be transferred to the appropriate court, and the appropriate court is the federal Court in Oregon. Plaintiffs would be filing this case there if CMO 1 were not applicable.

## PARTIES

### A. Plaintiffs

4. Tammie Davis is a resident of Central Point, Oregon in Jackson County. She is the legal guardian of Baby C.S. born on November 19th of 2016. Baby C.S. was born at Asante Rogue Regional Medical Center in Medford, OR and she was exposed in utero to prescribed opioids. Tammie Davis, as the legal guardian of Baby C.S., has the duty to care for the child and to provide all her needs arising from the injuries she has sustained as a result of her exposure to opioids in utero. Tammie

Davis is not seeking damages for her own personal injury: As the mother of her child, Tammie Davis has incurred and continues to incur economic damages related to the care of the child arising from the damages the child sustained as a result of the child's exposure to opioids in utero.

5. Baby C.S. has been diagnosed as a result of her exposure to opioids in utero with a condition referred to as Neonatal Abstinence (from opioids) Syndrome ("NAS").[1] As a consequence of that exposure, Baby C.S. has severe permanent disability and damages to her mind and body, and she has the right to sue, through her parent, for negligence and civil conspiracy.

**B. <u>Defendants</u>**

***Manufacturing Defendants***

6. Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Pharmaceuticals Inc. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. hereinafter are collectively referred to as "**Endo**.") Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Florida. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Oregon, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

7. Teva Pharmaceutical Industries, Ltd. ("**Teva Ltd.**") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("**Teva USA**") is a wholly- owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011. Teva Ltd., Teva USA, and

[1] The term "NAS" is defined to include additional, but medically-symptomatic identical, terminology and diagnostic criteria, including Neonatal Opioid Withdrawal Syndrome (NOWS) and other historically and regionally used medical and/or hospital diagnostic criteria for infants born addicted to opioids from in utero exposure.

Cephalon collaborate to market and sell Cephalon products in the U.S and in Florida at all times material. Teva Ltd. operates in Oregon and the rest of the U.S. through its subsidiaries Cephalon and Teva USA.

8. Allergan PLC ("**Allergan**") is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in January 2013. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013, later to Actavis PLC in October 2013. Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.). Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey and was formerly known as Watson Pharma, Inc. Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these defendants is owned by Allergan PLC, which uses them to market and sell its drugs in Oregon at all times material.

9. Indivior, Inc. ("**Indivior**") is a Delaware domestic corporation with its principal place of business in Richmond, Virginia. Indivior manufactures and distributes buprenorphine-based prescription drugs for treatment of opioid dependence. Buprenorphine and naloxone are Schedule III drugs. The company offers medication under the brand name Suboxone and sublingual tablets under the brand name Subutex. Indivior, Inc. is a subsidiary of Indivior, PLC, based in the United Kingdom. Indivior, Inc. was formerly known as Reckitt Benckiser Pharmaceuticals, Inc. Indivior, Inc. has manufactured and/or labeled buprenorphine and naloxone shipped to Oregon at all times material.

10. Mylan Pharmaceuticals, Inc. ("**Mylan**") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan manufactures, promotes, sells, and distributes

opioids in the U.S. and Oregon at all times material.

11. Cephalon, Inc. ("**Cephalon**") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Oregon at all times material.

12. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Johnson & Johnson ("**J&J**"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Ortho-McNeil-Janssen Pharmaceuticals, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen Pharmaceutica, Inc., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J hereinafter are collectively referred to as "**Janssen**."). Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Oregon at all times material.

13. Noramco, Inc. ("**Noramco**") is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned subsidiary of J&J and its manufacturer of active pharmaceutical ingredients until July 2016 when J&J sold its interests to SK Capital. Until 2016, Noramco wholly owned Tasmanian Alkaloids, Inc., the largest opium poppy producer in the state of Tasmania, Australia. During Noramco's ownership of Tasmanian Alkaloids, Noramco processed and imported Active Pharmaceutical Ingredients ("APIs") necessary for the production of opioid drugs to the United States and sold these APIs to Janssen and various other domestic opioid manufacturers.

14. Depomed, Inc. ("**Depomed**") is a California corporation with its principal place of business in Newark, California. Depomed describes itself as a specialty pharmaceutical company focused on pain and other central nervous system conditions. Depomed develops, markets, and sells prescription drugs in Oregon at all times material.

15. Par Pharmaceutical, Inc. is a New York corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly-owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc. Defendant Par Pharmaceuticals Companies, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York (Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively as "**Par Pharmaceutical**"). Par Pharmaceutical is an affiliate of Defendants Endo Health Solutions Inc. ("**EHS**") and Endo Pharmaceuticals, Inc. ("**EPI**). EHS, EPI, and Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates (collectively, "**Endo**"), manufacture opioids sold throughout the United States including in Oregon at all times material.

16. Endo, Indivior, Mylan, Cephalon, Teva, Janssen, Noramco, , Actavis, Depomed, and Par Pharmaceutical, are collectively referred to hereinafter as the "**Manufacturing Defendants**."

***Distributor Defendants***

17. CVS Health Corporation ("**CVS**") is a Delaware corporation with its principal place of business in Rhode Island. CVS, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. CVS also operates retail stores in numerous states, including in Florida, that sell prescription medicines, including opioids. At all times relevant to this Amended Complaint, CVS distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Oregon, at all times material.

18. McKesson Corporation ("**McKesson**") has its principal place of business in Irving, TX and is incorporated under the laws of Delaware. During all relevant times, McKesson has

distributed substantial amounts of prescription opioids to providers and retailers in the State of Oregon at all time materials.

19. Cardinal Health, Inc. ("**Cardinal**") has its principal place of business in Ohio and is incorporated under the laws of Ohio. During all relevant times, Cardinal has distributed substantial amounts of prescription opioids to providers and retailers in the State of Oregon at all times material

20. AmerisourceBergen Corporation ("**AmerisourceBergen**") has its principal place of business in Pennsylvania and is incorporated under the laws of Delaware. During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the State of Oregon at all times material.

21. Walgreens Boots Alliance, Inc., is a Delaware corporation with its principal place of business in Illinois. Defendant Walgreen Eastern Co. is a subsidiary of Walgreens Boots Alliance, Inc. that is engaged in the business of distributing pharmaceuticals, including prescription opioids. Defendant Walgreen, Co. is a subsidiary of Walgreens Boots Alliance that operates retail drug stores. Together, Walgreens Boots Alliance, Inc., Walgreen Eastern Co. and Walgreen Co. are referred to as "**Walgreens**." Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all relevant times, Walgreens has sold and continues to sell prescription opioids in close proximity to the hospitals, clinics, and other healthcare facilities serving the state of Oregon at all times material.

22. Wal-Mart Inc. f/k/a Walmart Stores, Inc. ("**Wal-Mart**"), is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Walmart, through its various DEA registered affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Amended Complaint, Wal-Mart distributed prescription opioids and engaged in the retail selling of opioids throughout the United States, including in Oregon at all times material.

23. H. D. Smith, LLC d/b/a HD Smith f/k/a H. D. Smith Wholesale Drug Co., H. D.

Smith Holdings, LLC, H. D. Smith Holding Company ("**H. D. Smith**") is a Delaware corporation with its principal place of business in Springfield, Illinois. H. D. Smith is a privately held independent pharmaceuticals distributor of wholesale brand, generic, and specialty pharmaceuticals. At all times relevant to this Complaint, H. D. Smith distributed prescription opioids throughout the United States, including Oregon, at all times material.

24. McKesson, Cardinal, AmerisourceBergen, CVS, Walgreens, Wal-Mart, and H.D. Smith, are collectively referred to hereinafter as "**Distributor Defendants**."

## A GENERATION OF DAMAGED CHILDREN FROM IN UTERO OPIOID EXPOSURE

25. Like thousands of children born every year, Baby C.S. was born dependent on opioids. Prenatal exposure to opioids in utero causes severe withdrawal symptoms, teratogenic defects and lasting developmental impacts. The first days of Baby C.S.'s life were spent in excruciating pain as doctors weaned her from opioid addiction. Baby C.S. will require years of treatment and counseling to deal with the effects of his prenatal exposure.

26. Baby C.S. and her biological mother are victims of the opioid crisis that has ravaged Oregon, causing immense suffering to those born addicted to opioids and great expense to those forced to deal with the aftermath.

27. At birth, Baby C.S. was diagnosed with Neonatal Abstinence Syndrome ("NAS"), arising from her biological mother's history of opioid use, and she was forced to endure a painful start to life: crying excessively, refusing to feed, shaking uncontrollably, and respiratory distress. NAS is a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used by the mother during pregnancy.

28. Baby C.S. spent her first days in the hospital writhing in agony as he endured detoxification and withdrawals from powerful opioids. Baby C.S. underwent Opioid Replacement Therapy to wean her from her involuntary addiction. Such treatment, while medically necessary to

save her life and lessen her suffering, prolong the negative health outcomes associated with her biological mother's ingestion of opioids.

29. Baby C.S.'s mother was prescribed Defendants' opioids prior to her gestation, resulting in her mother's opioid dependences/addictions and Baby C.S.'s opioid exposure during gestation.

30. Upon information and belief Baby C.S.'s mother consumed prescription Percocet, Norco, Suboxone, and other branded and generic opioids manufactured by one or more of the named Defendants.

31. Defendants misrepresented the efficacy and safety of their products to the point that it caused addiction. Defendant Pharmacies failed to alert the authorities about questionable orders and abuses as well as failed to take action to avoid the adverse consequences of those orders and abuses.

32. Baby C.S.'s experiences are part of an opioid epidemic sweeping through the United States, including the State of Oregon, that has caused thousands of infants great suffering and continuing developmental issues. Other than the Covid-19 pandemic, the opioid epidemic is the largest health care crisis in United States history.

33. Many of the victims of the opioid epidemic, and certainly some of the most harmed, are babies born with opioid-induced Neonatal Abstinence Syndrome ("NAS"). These babies likely experience DNA changes at the cellular level, particularly in the tissues of the brain and nervous system and suffer lifelong afflictions as a result of maternal use of prescription opioid medications during gestation. These patients often require extensive care because they are likely to experience lifelong mental health problems and disorders, developmental impairment and cognitive defects, and physical health limitations and disorders.

34. The number of infants born suffering from this insidious condition is staggering. As staggering is the fact that CDC reports that one third of all pregnant women in the United States are

prescribed opioids during the course of their pregnancy, that is, over one million mothers during their pregnancy each year.

35. Children with NAS diagnoses are at increased risk for neuropsychological disfunction. Research arising from the opioid epidemic reveals that all children exposed to opioids in utero are at a substantially higher risk for lower mental abilities and for attention deficits, and that these effects will persist or worsen through adolescence.

36. Specifically, children diagnosed with NAS, including Baby C.S., exhibit or will exhibit:

a. By age 1: diminished performance on the Psychomotor Development Index, growth retardation, poor fine motor skills, short attention span, diminished intellectual performance;

b. Between ages 2-3: significantly lower cognitive abilities, including lower motor development, lower IQ, and poor language development;

c. Between ages 3-6: significant detrimental impact on self-regulation, including aggressiveness, hyperactivity, lack of concentration, lack of social inhibition, lower IQs (8-15 point difference), poor language development, and behavioral and school problems; and

d. These damages, symptoms and disfunctions progress with age.

37. Other major risks from in utero opioid exposure are defects at birth including altered brain development, muscular-skeletal system deficiencies, digestive system deficiencies, cardio-vascular system deficiencies and nervous system deficiencies.

38. Baby C.S.'s exposure to opioids in utero were a known consequence of her mother's ingestion of the opioids during pregnancy.

39. In utero exposure to opioids causes a generalized multi-system disorder that produces a constellation of symptoms.

40. Opioid Replacement Therapy in neonates is associated with a plethora of negative health impacts including, but not limited to, reduced brain and somatic growth, intractable nystagmus, altered visual evoked potentials, delayed encephalopathy, respiratory depression, bradycardia, hypotension, urinary retention, and reduced gut motility and emesis.

41. Specifically, the widely-used Opioid Replacement Therapy agent, buprenorphine, one of the active ingredients of Subutex, has been associated with extremely poor outcomes in children including congenital heart disease, urinary collecting system defects, ophthalmic defects and maxillofacial defects *inter alia*.

42. Cognitive development is impaired in children exposed to opioids in utero, causing them to face a significantly increased risk of mental, speech/language and emotional disorders.

43. Manufacturing Defendants failed to disclose the negative health impacts known to them, including teratogenic and mutagenic effects, in their marketing materials, package inserts, label warnings, unbranded research, captive advocacy group communications, FDA applications, FDA filings or any other means of communication.

**DEFENDANTS ENTERED INTO A DECEITFUL SCHEME**

**TO EXPAND THE DEMAND FOR OPIOIDS**

44. Defendants' pathway to maximizing profits was constrained by the amount of medically necessary opioids that could be sold through controlled channels. The stark reality Defendants faced in terms of maximizing profits was that they could only sell so many prescription opioids to dying cancer patients. The logic was simple: While the number of cancer patients was not likely to increase drastically from one year to the next, if a company could expand the indications for use of a particular drug, then it could boost sales exponentially without any real change in the country's health demography. And, without a new and robust primary market, there would be no supply for the secondary "spill-over" diversionary market that they intended.

45. Once exposed, users of the opioids could easily transition into the secondary market, which was necessarily supplied from the primary market, which Defendants were legally charged with insuring there was no supply for. Soon, the demand from the secondary market was further driving prescriptions written for the primary market.

46. Thus, began the Manufacturing Defendants' quest to open a new primary market for opioid prescriptions: treatment of (a) chronic, (b) widespread pain (c) without dose limits. And, their "ace in the hole" was this: not only could they convince physicians to write prescriptions into this new market, they could ensure through the insidious mechanism of addiction that patients, including Florida women of child-bearing age, would have to keep coming back for more. With the power to create both unlimited supply and unlimited demand for these highly-addictive substances, the Manufacturing Defendants set out to create this new primary market. Each of the elements of the new primary market were selected to maximize sales of the highly addictive drugs. Manufacturing Defendants were the architects of the transition from a limited market pool of disease and injury (i.e., cancer, disorders requiring surgery, etc.) to widespread use to treat an ever-enlarging pool of common, non-life threatening, maladies and conditions, such as arthritis, back pain, and joint pain. Therefore, the universe of targeted patient conditions could be vastly expanded by Manufacturing Defendants.

47. Next up was the Manufacturing Defendants' successful promotion of highly addictive opioids for chronic, i.e., long-term conditions; this step was critical to ensuring that the newly targeted patient conditions would not result in one-time sales.

48. Finally, to ensure even further sales growth and profits, the Manufacturing Defendants promoted the notion that there were no dose limits and, indeed, that patients who appeared to be addicted were actually patients who should be given even more and higher dosages for opioids.

49. In order to maximize profits, the Manufacturing Defendants collectively had to

convince physicians to expand treatment of their patients to include chronic and "non-malignant", i.e., non-cancer, pain. The Manufacturing Defendants engaged in this activity despite the fact that they knew that the benefits of opioids are minimal in comparison to known risks, which are extreme, even fatal. Prospective, randomized, controlled trials lasting at least 4 weeks that evaluated the use of opioids for chronic non-cancer-related pain showed only a negligible to modest improvement in pain-relief and no consistent improvement in physical functioning. The maximal adverse risks, however, included a "high incidence of opioid abuse behaviors" and "addiction."

50. The Manufacturing Defendants secured a highly potent and stable supply of the Active Pharmaceutical Ingredients ("API") in opioids. Janssen actively conspired with other Manufacturing and Distributor Defendants to significantly increase the supply of powerful opioid drugs in the market, thereby exacerbating the opioid epidemic. J&J grew poppies in Tasmania, Australia, and imported and sold APIs derived from these poppies necessary for the manufacture of opioid drugs to other Manufacturing Defendants Beginning in 1990 and continuing until at least 2016, J&J's wholly owned subsidiaries, Noramco and Tasmanian Alkaloids Limited ("Tasmanian Alkaloids"), supplied opioid manufacturers with the raw APIs necessary to meet the growing demand for powerful opioid drugs as the opioid epidemic increased in severity.

51. As the opioid crisis worsened, Tasmanian Alkaloids engaged in the cultivation, breeding, and processing of opium poppy plants into compounds necessary for the production of opioid APIs in Tasmania. J&J through its subsidiaries developed the Norman Poppy, a strain of the plant containing high levels of the compound *Thebaine*, which is a critical ingredient for the production of oxycodone, oxymorphone, nalbuphine, naltrexone, naloxone, and buprenorphine, the latter two of the active ingredients in Suboxone. The high-Thebaine Norman Poppy was patented by Tasmanian Alkaloids in 1994.

52. These raw ingredients derived from the Norman Poppy were then imported to the

United States by Noramco. Noramco imported the raw ingredients produced by Tasmanian Alkaloids to the United States, processed the raw ingredients into opioid APIs, and sold these APIs to opioid manufacturers in the United States. Upon information and belief, J&J's supplying of raw opioid ingredients enabled Manufacturing Defendants to meet the growing demand for powerful and dangerous opioid drugs formed in the wake of the pharmaceutical industry's misleading mass marketing of opioid drugs to the medical community and directly to the public. By enabling the large-scale manufacture of these opioid drugs, J&J conspired to create an opioid epidemic, addicting millions of Americans to opioid drugs and significantly increasing instances of babies being exposed to opioids in utero.

53. Through the use of a highly coordinated, expensive, misleading, illegal, and callous manipulation of both the sales and distribution schemes for controlled substances within the United States, the Defendants expanded the market and flooded the country with highly addictive opiates.

54. To establish and exploit the lucrative market of chronic pain patients, each Manufacturing Defendant developed a well-funded, sophisticated, and fraudulent marketing and distribution scheme targeted at consumers and physicians. These Defendants used direct marketing, as well as veiled advertising by seemingly independent third parties, to spread misrepresentations about the risks and benefits of long-term opioid use – statements that created the "new" market for prescription opioids, upended the standard medical practice, and benefited other opioid Manufacturing Defendants. These statements were deceptive, false, and unfair. They were not supported by, and in fact contrary to, the scientific evidence. These statements were also contrary to pronouncements by and guidance from the FDA and CDC based on that evidence.

55. The Manufacturing Defendants spread their false, deceptive, and unfair statements by marketing their branded opioids directly to doctors and patients in the State of Florida. In fact, they specifically targeted susceptible prescribers and vulnerable patient populations, including those in

Florida. Defendants also deployed seemingly unbiased and independent third parties that they controlled to spread their false, reckless, and/or negligent statements about the risks and benefits of opioids for the treatment of chronic pain throughout geographic areas and patient demographics of Florida.

56. The Manufacturing Defendants also entered into and/or benefitted from arrangements with seemingly unbiased and independent organizations or groups that generated treatment guidelines, unbranded materials, and programs promoting chronic opioid therapy, including the American Pain Foundation ("APF"), American Academy of Pain ("AAP"), American Pain Society ("APS"), American Geriatrics Society ("AGS"), the Federation of State Medical Boards ("FSMB"), U.S. Pain Foundation ("USPF"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), and Pain & Policy Studies Group ("PPSG").

57. Patient advocacy organizations and professional societies like these play a significant role in shaping health policy debates, setting national guidelines for patient treatment, raising disease awareness, and educating the public.

58. The Manufacturing Defendants collaborated, through the aforementioned organizations and groups, to spread false, reckless, and/or negligent messages about the risks and benefits of long-term opioid therapy.

59. The Defendants also had systematic links to and personal relationships with each other through their participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities, including but not limited to, the Pain Care Forum ("PCF") and the Healthcare Distribution Alliance ("HDA").

60. The PCF has been described as a coalition of drug makers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news

story when it was discovered that lobbyists for members of the PCF, including the Manufacturing Defendants, quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

61. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.

62. Not surprisingly, each of the Manufacturing Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.

63. In 2012, membership and participating organizations in the PCF included the HDA (of which all the Manufacturing Defendants are members), Endo, Johnson & Johnson (the parent company of Janssen Pharmaceuticals), and Teva (the parent company of Cephalon).

64. To convince doctors and patients in Florida that opioids can and should be used to treat chronic pain, these Defendants had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by misrepresenting the risks and benefits of long-term opioid use to those doctors and patients, these Defendants made claims that were not supported by, or were contrary to, the scientific evidence and which were contradicted by data.

65. To convince doctors and patients that opioids are safe, the Manufacturing Defendants negligently trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low- risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose

special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

66. The Manufacturing Defendants falsely claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed (as opposed to obtained illicitly), and failed to disclose the greater risk of addiction with prolonged use of opioids.

67. The Manufacturing Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk of addiction and other health consequences and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief.

68. Each Manufacturing Defendant engaged in misleading marketing activities that resulted in a substantial increase in the supply of prescription opioids and proximately caused harm to Baby C.S..

69. As demonstrated by the allegations above, the Manufacturing Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and negligent.

70. The Manufacturing Defendants' fraudulent, reckless, and negligent marketing scheme caused, and continues to cause, doctors in Florida to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent these Defendants' negligent marketing scheme, these doctors would not have prescribed as many opioids. These Defendants' negligent marketing scheme also caused, and continues to cause, patients to purchase and use opioids for their chronic pain, believing they are safe and effective. Absent these Defendants' negligent

marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

71. The Manufacturing Defendants' fraudulent, reckless, and negligent marketing has caused, and continues to cause, the prescribing and use of opioids to explode. Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their negligent marketing scheme. Defendants' spending on opioid marketing exceeded hundreds of millions of dollars per year.

72. The escalating number of opioid prescriptions written by doctors who were deceived by the Manufacturing Defendants' marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the United States and Florida.

73. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse.

74. Contrary to the Manufacturing Defendants' misrepresentations, most opioid addiction begins with legitimately prescribed opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful.

75. The Manufacturing Defendants also failed to prevent diversion of the drugs they manufactured, and failed to monitor, report, and prevent suspicious orders of prescription opioids in accordance with federal law.

76. Moreover, at all times relevant to this Complaint, the Manufacturing Defendants took steps to avoid detection of, and to fraudulently conceal, their negligent marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturing Defendants disguised their own role in the negligent marketing of chronic opioid therapy by funding and working through third parties like professional societies and "key opinion leaders" ("KOLs"). These Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for

the accuracy and integrity of Defendants' false and negligent statements about the risks and benefits of long-term opioid use for chronic pain.

77. The Manufacturing Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. These Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, fake independent groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturing Defendants, such as Janssen, ran similar websites that masked their own direct role.

78. Finally, the Manufacturing Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. These Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for these Defendants' negligent messages was not apparent to medical professionals who relied upon them in making treatment decisions.

79. **DEFENDANTS UNLAWFULLY FLOODED THE MARKET WITH OPIOIDS** The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

80. Defendants thus intentionally and negligently created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers - with distributors regularly fulfilling

suspicious orders from pharmacies and clinics, who were economically incentivized to ignore "red flags" at the point of sale and before dispensing the pills.

81. Defendants' wrongful conduct has allowed billions of opioid pills to be diverted from legitimate channels of distribution into the illicit drug market in quantities that have fueled the opioid epidemic in Florida. This is characterized as "opioid diversion" and created a secondary market. Acting against their common law and statutory duties, Defendants have created an environment in which opioid diversion is rampant. As a result, opioid users have ready access to illicit sources of diverted opioids.

82. Defendants and their agents have had the ability to substantially reduce the consequences of opioid diversion, including the damages done to infants exposed to opioids in utero. All the Defendants in this action share responsibility for perpetuating the epidemic and the increase in the number of afflicted infants exposed in utero, including Baby C.S.

83. Defendants, by their actions and omissions, knowingly or negligently have distributed and dispensed prescription opioid drugs in a manner that foreseeably damaged, and continues to damage, those exposed to opioids in utero, including Baby C.S. and her mother.

84. The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85-90% of all revenues from drug distribution in the United States – an estimated $378.4 billion in 2015. The distributors then supply opioids to pharmacies, doctors, and other healthcare providers, who then dispense the drugs to patients.

85. Manufacturer Defendants and Distributor Defendants share the responsibility for controlling the availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of

distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain.

86. For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration.

87. Diversion occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses.

88. Opioid diversion occurs in the United States at an alarming rate. In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

89. Every year, thousands of people in Florida misuse and abuse opioid pain relievers that can lead to addiction, NAS, overdose and death.

90. Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.

91. The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The strongest risk factor for a heroin use disorder is prescription opioid use. Studies revealed that 75% of those who began their opioid abuse in the 2000s started with prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

92. Distributor Defendants have a duty to exercise reasonable care under the

circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

93. In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the CSA, 21 U.S.C. § 801 et seq. and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violations of these requirements show that they failed to meet the relevant standard of conduct that society expects from them. The Distributor Defendants' repeated, unabashed, and prolific violations of these requirements show that they have acted in total reckless disregard.

94. By violating the CSA, the Distributor Defendants are also liable under the law of Florida as herein alleged.

95. The Distributors Defendants have knowingly or negligently allowed diversion. Their wrongful conduct and inaction have resulted in numerous civil fines and other penalties recovered by state and federal agencies, including actions by the DEA related to violations of the CSA.

96. The Distributor Defendants have the ability and owe the duty to prevent opioid diversion, which presented a known or foreseeable risk of damage to Baby C.S. and her mother.

97. The Distributor Defendants have supplied massive quantities of prescription opioids in Florida with the actual or constructive knowledge that the opioids were ultimately being consumed by citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

98. Each Distributor Defendant knew or should have known that the amount of the

opioids that it allowed to flow into Florida was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

99. The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in Florida; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

100. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the consumer market of Florida with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

101. It was reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including neo-natal addiction and NAS.

102. The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

103. The Distributor Defendants knew or should have known that a substantial amount of

the opioids dispensed to patients and citizens of Florida were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, and Baby C.S. and her mother.

104. The Distributor Defendants were aware of widespread prescription opioid abuse of persons who would become patients in Florida, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas – and in such quantities, and with such frequency – that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

105. Having knowledge and/or notice of the damages that their conduct had caused to Baby C.S.. and her mother, the Distributor Defendants failed to take other steps to help curb the damages already incurred by Baby C.S. and her mother.

106. The Distributor Defendants made substantial profits over the years based on the diversion of opioids affecting Florida. Their participation and cooperation in a common enterprise has foreseeably caused damages to Plaintiffs. The Distributor Defendants could and did foresee that children of women prescribed opioids, such as Baby C.S., would be injured.

107. The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to communities showed an intentional or reckless disregard for Baby C.S. and her mother.

## INDIVIDUAL CAUSES OF ACTION
## COUNT I - NEGLIGENCE

108. Plaintiff reasserts the allegations of the foregoing paragraphs as if set forth fully herein.

109. By their applications to the Food and Drug Administration, the Defendants had the duty to investigate and fully disclose all of the known consequences from the use of drugs each Manufacturing Defendant produced and to protect the consumers of the drugs from harm consistent with the legal standard of reasonable conduct under the circumstances in light of the risk involved.

110. Defendants' breach of their duty proximately caused the injuries and damages to Baby C.S. and her mother.

111. Defendants' conduct fell below the reasonable standard of care and was negligent. Their negligent acts include:

a. Consciously supplying the market in Florida with highly-addictive prescription opioids, including misrepresenting, understating, or obfuscating the highly addictive propensities of opioids;

b. Using deceptive and misleading marketing, labeling, distribution, and dispensing practices, including failing to provide adequate warnings of potential harm to pregnant women of child bearing age and their babies;

c. Affirmatively enhancing the risk of harm from prescription opioids by not protecting against diversion;

d. Failing to properly review and analyze prescription orders and data for red flags;

e. Failing to report suspicious orders or refuse to fill them;

f. Failing to provide effective controls and procedures to detect and/or guard against theft and diversion of controlled substances;

g. Failing to police the integrity of their supply chains;

h. Creating false and misleading information with the intention of having prescribing physicians rely upon it; and

i. Failing to disclose the foreseeable injuries to babies exposed to opioids in utero.

112. It is known that opioids are controlled substances and dangerous commodities, that are highly addictive and potentially harmful. Each Defendant is required to take reasonable action to assess risk and reduce harm to individuals, including children exposed in utero. These Defendants

breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their businesses.

113. Defendants owed a special duty to those individuals using their product including Baby C.S. and her mother.

114. Baby C.S. is without fault. The injuries to Baby C.S. would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the manufacturing, distribution and dispensing of controlled substances.

**COUNT II - CIVIL CONSPIRACY**

115. Plaintiff reasserts the allegations in the foregoing paragraphs as if fully set out herein.

116. It is well documented that the Defendants have acted in concert to mislead medical professionals, patients, the scientific community, the CDC, the FDA, the DEA and the general public about the addictive nature of opioids and the risk of serious injury associated with in utero exposure to opioids for the sole purpose of creating a greater market through deception.

117. The Manufacturing Defendants continuously supplied prescription opioids to the Distributor Defendants despite having had knowledge that said Distributors were breaching their common law duties and the requirements of the Controlled Substances Act.

118. The Distributor Defendants continuously supplied prescription opioids to pharmacies despite having knowledge that the pharmacies were breaching their common law duties and the requirements of the Controlled Substances Act.

119. Each of the Defendants acted knowingly and in concert with each other with a common purpose to increase sales and maximize the profit without regard to the grave harm it could and did cause to Baby C.S. and others through their common efforts through deceptive advertising, marketing and lobbying.

120. At all relevant times, without concern for the truth, and for the sole purpose of

expanding the market inappropriately, the Defendants manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised and promoted the use of prescription opioid drugs. The net result of this marketing was to flood the market with highly addictive, dangerous opioids. But for the Defendants' failure to comply with their legal obligations, the secondary market for opioids could not have existed.

121. The conspiratorial acts or omissions described herein proximately caused the damages sustained by Baby C.S.

## COUNT II – PUNITIVE DAMAGES

122. Plaintiffs reassert each and every allegation set forth in all preceding paragraphs as if fully restated herein.

123. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants.

124. Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs.

125. Defendants realized the imminence of danger to Plaintiffs and other members of the public but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

126. As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminal indifference to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs suffered the injuries and dangers stated above.

127. Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

128. The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

## PRAYER FOR RELIEF FOR COUNTS I AND II

**WHEREFORE**, Plaintiff Tammie Davis, individually and as the Legal Guardian of Baby C.S., requests that the Court grant compensatory damages for

a. physical injuries and mental pain and suffering (past and future);

b. medical expenses (past and future), and all care medically necessary by Baby C.S.'s injuries;

c. loss of earning capacity;

d. physical and mental disability and impairment;

e. loss of enjoyment of life;

f. all other damages awardable at law or in equity; and

g. Reserves the right to seek amendment of the complaint to add punitive damages.

Further, Plaintiff demands Trial by Jury.

DATED: November 19, 2021

Respectfully submitted by:

*/s/Celeste Brustowicz*
COOPER LAW FIRM
Celeste Brustowicz
1525 Religious Street
New Orleans, Louisiana 70130
Telephone: 504-399-0009
Facsimile: 504-309-6989
Email: cbrustowicz@clfnola.com
**TRIAL COUNSEL**

*/s/Don Creadore*
CREADORE LAW FIRM
Donald E. Creadore
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone: 212-355-7200
Email: donald@creadorelawfirm.com

*/s/Kevin Thompson*
THOMPSON BARNEY, PLLC
Kevin Thompson
2030 Kanawha Boulevard
East Charleston, West Virginia
Telephone: 304-343-4401
Email: kwthompsonwv@gmail.com
**TRIAL COUNSEL**

THE LAW OFFICES OF KENT HARRISON ROBBINS, P.A.
Kent Harrison Robbins
242 Northeast 27th Street
Miami, Florida 33137
Telephone: (305) 532-0500
Facsimile: (305) 531-0150
Email: khr@khrlawoffices.com
Secondary: ereyes@khrlawoffices.com
Tertiary: assistant@khrlawoffices.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th of November, 2021, a copy of the above and foregoing has been electronically filed with the Clerk of Court using the CM/ECF system, which provides an electronic service notification to all counsel of record registered as CM/ECF users.

***/s/Celeste Brustowicz***
COOPER LAW FIRM
Celeste Brustowicz